# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| HARRY FOSTER, III, and | ) | |
| LINDA FOSTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:10-CV-20-TLS |
| | ) | |
| STATE FARM FIRE AND | ) | |
| CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After a fire occurred at the home of Harry and Linda Foster, they sought coverage under a homeowner's policy issued by the Defendant, State Farm Fire and Casualty Company. Nearly one year after the fire, the Fosters filed this lawsuit for breach of contract and breach of the duty of good faith. At the time the Plaintiffs filed suit, State Farm was still investigating the claim, which included attempting to obtain further documentation from the Plaintiffs and completing the Examination Under Oath (EUO) of Mrs. Foster, and had not yet issued a claims decision. By way of a Motion for Summary Judgment filed on December 17, 2010 [ECF No. 21], State Farm seeks a determination as a matter of law that the insurance contract is null and void because the Plaintiffs breached the contract when they did not fully comply with their contractual duties to provide documents and submit to EUOs. The Plaintiffs counter that they produced every document they possessed or were able to obtain and submitted to all requested EUOs, and that a jury should be allowed to determine whether the Defendant's actions in relation to their claim constituted bad faith.

# BACKGROUND

On December 30, 2009, Harry Foster III and Linda Foster filed this lawsuit against State Farm Fire and Casualty Company in Allen County Circuit Court. Count I of the Complaint is for breach of contract and accuses the Defendant of breaching its contractual obligation to provide coverage and pay the Plaintiffs' $2,888,432 claim for the loss of their dwelling and personal property caused by a fire. Count II is for bad faith and punitive damages. The allegations underlying this claim are that the Defendant did not act in good faith when it refused to adjust the Plaintiffs' loss and instead accused the Plaintiffs of directly causing or arranging for a loss to covered property and of intentionally concealing or misrepresenting material facts in recorded statements and EUOs, during the course of investigation, and in the statement of loss forms, and when it wrongfully assumed the fire investigation and conducted a biased investigation into the cause and origin of the fire.

On January 21, 2010, the Defendant removed the case to this Court. On March 3, the Defendant filed its Answer and Affirmative Defenses, including the defense that the Plaintiffs' claims may be barred for failure to comply with the terms of the insurance contract titled "Your Duties After Loss." (ECF No. 9, Aff. Defs. ¶ 9.) On December 17, the Defendant filed a Motion for Summary Judgment [ECF No.  21] on the Plaintiffs' claims. The Defendant argues that the insurance contract was rendered null and void by the Plaintiffs' breach of the contract, that it did not commit the intentional tort of bad faith in handling the Plaintiff's insurance claim, and that the Plaintiffs are not entitled to recover punitive damages. The Defendant contends that the Plaintiffs have failed to provide all of the documents and information the Defendant has requested as part of its investigation, and that the EUO of Mrs. Foster was never completed due to this failure to

provide information. The Defendant emphasizes that the Plaintiffs filed this lawsuit before the Defendant rendered its claim decision, and before the Plaintiffs complied with the policy provisions, which it maintains is a separate breach of the contract.

In the Plaintiffs' Brief in Response to Defendant's Motion for Summary Judgment [ECF No. 27], filed on January 14, 2011, the Plaintiffs argue that they cannot be required to produce documents that they do not have, and that they informed the Defendant that they had no further documents to produce and were prepared to complete Mrs. Foster's EUO. The Plaintiffs claim that the Defendant's failure to make a claims decision before the expiration of the one-year statute of limitations set forth in the insurance contract or to offer a tolling agreement related to the limitations period is prima facie evidence of bad faith, and that when this failure to make a decision is coupled with "what is clearly a futile and unnecessary effort to investigate the fire" it is positive evidence of the Defendant's bad faith. (Pls.' Br. 3, ECF No. 27.)

On January 28, the Defendant filed a Reply in Support of Motion for Summary Judgment [ECF No. 28]. In addition to highlighting the evidence it contends establishes, as a matter of law, that the Plaintiffs breached their duties under the insurance contract, the Defendant argues that the Plaintiffs initiated a lawsuit prematurely "despite numerous assurances from State Farm that they had an additional year to bring claims" after the recent implementation of Indiana Code § 27-1-13-17, which established a two-year statute of limitations for a policyholder to bring claims against an insurer. (Def.'s Reply 2, 28.)

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure state that a "court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). *See also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants").

In deciding to what insurance coverage, if any, the Plaintiff is entitled, the Court must apply Indiana law for contract interpretation. *Allstate Ins. Co. v. Keca*, 368 F.3d 793, 796 (7th Cir. 2004) ("A federal court sitting in diversity has the obligation to apply the law of the state as it believes the highest court of the state would apply it if presented with the issue."). An insurance contract "is subject to the same rules of interpretation as are other contracts." *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006) (citing *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 537–38 (Ind. 1997)). "If the language in the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning, but if the language is ambiguous, the insurance

contract should be strictly construed against the insurance company." *Id.*


# MATERIAL FACTS

The Plaintiffs' home was insured under a Homeowners Policy (the Policy) issued by the

Defendant. The Policy provided coverage for loss to dwelling and loss to personal property.

Section I of the Policy sets forth Conditions, including the following:

2. **Your Duties After Loss**. After a loss to which this insurance may apply, you shall see that the following duties are performed:

* * *

c.      Prepare an inventory of damaged or stolen personal property. Show in detail the quantity, description, age, replacement cost and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

d.      as often as we reasonably require:

    (1)      exhibit the damaged property;
    (2)      provide us with records and documents we request and permit us to make copies;
    (3)      submit to and subscribe, while not in the presence of any other insured:
        (a)      statements; and
        (b)      examinations under oath; and
    (4)      produce employees, members of the insured's household or others for examination under oath to the extent it is within the insured's power to do so; and

e.      submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

    (1)      the time and cause of loss;
    (2)      interest of the insured and all others in the property involved and all encumbrances on the property;
    (3)      other insurance which may cover loss;
    (4)      changes in title or occupancy of the property during the term of this policy;

(5)     specifications of any damaged building and detailed estimates for repair of the damage;

(6)     an inventory of damaged or stolen personal property as described in 2.c.;

(7)     receipts for additional living expenses incurred and records supporting the fair rental value loss; and

(8)     evidence or affidavit supporting a claim under the Credit Card, Bank Transfer Fund Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

* * *

6. **Suit Against Us**. No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage.

(Policy 14-BA-M587-2 at 13–14, ECF No. 21-2 at 17–18.)

On January 3, 2009, a fire damaged the Plaintiffs' residence. The Plaintiffs, Mr. Foster's father (Grandpa Foster), the Plaintiffs' two sons (Harry and Jamison), and eight dogs lived at the residence, but none of them were at home at the time of the fire. On January 4, Mrs. Foster submitted a claim to the Defendant for fire damage to the home. Brent Kilbourne was assigned as the Claims Representative for the Plaintiffs' claim, and Charles Korensky was assigned as a Claims Representative with the Special Investigative Unit. After Kilbourne inspected the loss, he also retained Steve Shand of Shand Forensics to conduct a cause and origin investigation.

The following is a timeline of the interactions between the Plaintiffs and the Defendant over the course of the year following the fire:

- January 13–14, 2009: The Plaintiffs execute authorizations—valid for the duration of the claim—for the Defendant to request any financial, employment, credit, indebtedness, and telephone documents and records. Korensky takes the recorded statements of the Plaintiffs where he learns the whereabouts of the family members during the fire, that Mr. Foster

owned the Foster Law Office and Mrs. Foster owned a dog breeding business, that the Plaintiffs had various personal and business accounts, and that the Plaintiffs were involved in several lawsuits.

- January 18, 2009: Kilbourne calls Mrs. Foster to explain that he needs the blueprints to the Foster's home. She gives him information about the electrical components of the home, the builder, and the company that installed an elevator shortly before the fire.

- January 27, 2009: Kilbourne sends a letter to the Plaintiffs to follow up on document and information requests. The letter lists seven categories of documents necessary to investigate the claim and to assess the Plaintiffs' additional living expenses.

- March 3, 2009: Kilbourne hand delivers a letter to the Plaintiffs' public adjustor setting forth the policy language relating to the Plaintiffs' duties after a loss, including their duty to provide records and documents requested and to submit to statement and examinations under oath. The letter states that the Sworn Proof of Loss Statement is due on May 2, 2009.

- March 17, 2009: Kilbourne and Korensky learn that Shand determined that the cause of the fire was incendiary and that samples taken form the theater room tested positive for gasoline. The Defendant sends the claim to the Special Investigative Unit for handling, and sends a letter to the Plaintiffs reserving its right to deny coverage because a question remains whether the loss was accidental as it relates to the named insureds.

- March 19, 2009: Korensky speaks to Mrs. Foster and explains that the Defendant sent a reservation of rights letter because the fire was incendiary, and that he would be gathering information as he processed the claim. Mrs. Foster provided some information regarding bank accounts and agreed to provide cell phone records.

- March 25, 2009: Korensky sends a letter to the Plaintiffs' lawyer, Bruce Stier, requesting twelve categories of documents from the Plaintiffs, including transaction histories from various bank and credit accounts, cell phone records, contact information for certain family members, tax returns, and a completed medical release form. The letter points out the Plaintiffs' policy duties and asks for the documents on or before May 2, 2009.

- April 21, 2009: Korensky sends a letter responding to Stier's request for an extension of time for the Plaintiffs to file a proof of loss. Korensky states that he is "happy to oblige" the request and wants "to provide the Fosters every reasonable opportunity to comply with their policy." (ECF No. 21-4 at 67.) Korensky also states that before the Plaintiffs retained Stier Mrs. Foster told Korensky that she had acquired detailed cell phone records, and he requests that Stier produce the records and any other documents that the Plaintiffs have already gathered, because this will help move the matter forward more quickly. Koresky notes that he has already provided the contact information for various financial institutions that could provide the Plaintiffs with the records he requests and asks Stier to let Korensky know if there is some other way he can help to retrieve the information and documents in a timely manner.

- May 1, 2009: Korensky sends a letter to the Plaintiffs following a telephone conversation held on April 28, where the Plaintiffs advised him that they were going to hire a new attorney. The letter sets forth that pursuant to the Plaintiffs' request, the Defendant agrees to extend the date for submitting the Proof of Loss and supporting documentation an additional 90 days, to and including August 5, 2009. The letter requests that the Plaintiffs provide any and all of the requested information as soon as it is received and explains that

he has still not received the cell phone records. The letter sets forth that while some of the documents requested may have been damaged or destroyed in the fire, most are readily accessible. Enclosed with the letter is Form 4506 and directions for the Plaintiffs to request copies of their tax returns, along with a draft in the amount of $228.00 for the IRS fees. The letter reiterates the twelve categories of documents previously requested and makes one additional request for their 2008 tax return, as well as the name and contact information for the company that supplied and serviced the credit/debit card machine for the Foster Law Office. The letter again cites the policy language relating to the Plaintiffs' duties after the loss.

- May 20, 2009: the Plaintiffs' new counsel, Thomas E. Hastings, sends a letter to the Defendant and encloses partial Sprint cell phone bills and an executed Medical Release for Mrs. Foster. The letter sets forth that the majority of the remaining documents will be forwarded as soon as Mrs. Foster receives them. Hastings also states that the 2008 tax returns will be provided once they are prepared and that Mrs. Foster will obtain the name of the company that supplied and serviced the credit/debit card machine for the Foster Law Office. Hastings indicates that his colleague, Sam Krahulik, will be doing much of the work obtaining the documents that the Defendant requested and states that "[i]f there any other documents that you require, please contact me or Sam Krahulik and we will attempt to obtain them promptly." (ECF No. 21-4 at 77.)

- July 1, 2009: Krahulik sends a letter to the Defendant stating that "Mrs. Foster is close to obtaining the information and documents you've requested in your previous letters." (ECF No. 21-4 at 80.) Krahulik states that he hopes to send responsive documents the following

week and that the Plaintiffs are working hard to complete the Proof of Loss by the August deadline. Krahulik advises that he is working with the Defendant's counsel, Jeffrey Oberlies, to schedule the EUOs of Mr. and Mrs. Foster, Harry Foster, Jamison Foster, and Grandpa Foster.

- July 6, 2009: Korensky sends a letter to the Plaintiffs' counsel stating his understanding that based on a conversation between Oberlies and Krahulik, the Plaintiffs have reported that they gathered (but had not submitted) 80% to 90% of the information and documents requested and are working toward presenting their Sworn Proof of Loss Statement. The letter identifies the information that the Defendant has already received and sets forth eight categories of documents originally requested on May 1, 2009, that are still outstanding.

- July 29, 2009: The Plaintiffs' counsel delivers some documents to the Defendants and a financial authorization from the Plaintiffs and indicates that he will provide the records he is able to obtain as soon as they are received.

- July 31, 2009: Oberlies sends a letter to the Plaintiffs' counsel confirming the EUO schedule and setting out a more comprehensive list of requested documents numbered 1 through 27, many of which Oberlies notes Koresnky had already requested in his March 25 and May 1 letters. Oberlies requests that the Plaintiffs review their recorded statements prior to the EUOs and that the documents be produced by the time of the EUO. Korensky's new requests are based on his discovery of numerous previously undisclosed bank accounts and issues that require further investigation by the Defendant in making a claims decision.

- August 5, 2009: the Plaintiffs deliver close to 1000 pages of documents to Korensky, including their Proof of Loss.

- August 7, 2009: Oberlies sends a letter to the Plaintiffs' counsel confirming that the Defendant received documents on August 5, 2009. The letter asserts the parties' understanding that the Plaintiffs are still attempting to gather information requested for the upcoming EUO, and that as additional information is provided it may be necessary to take supplemental EOUs.

- August 13 and August 25, 2009: Mr. Foster submits to an EUO, but does not bring all the documents the Defendant requested. Korensky, who is in attendance, believes that Mr. Foster's EOU reveals significant information concerning previously undisclosed bank accounts, business dealings, and other information relevant to the Defendant's investigation. Oberlies makes additional requests during the EUO and it is agreed that he will present the requests in writing.

- August 26, 2009: Mrs. Foster submits to an EUO, but does not bring all the documents the Defendant requested. Korensky gets the impression that Mrs. Foster's EOU reveals significant information concerning previously undisclosed bank accounts, business dealings, and other information relevant to the Defendant's investigation. Oberlies makes additional requests during the EUO and it is agreed that he will present those requests in writing.

- September 3, 2009: Oberlies sends a letter to Plaintiffs' counsel to confirm his understanding that the parties will reschedule the conclusion of Mrs. Foster's EUO for September 9 and 10, 2009. The letter asks Mrs. Foster to review her recorded statement before her EUO and be prepared to discuss any changes she makes to the statement. The letter confirms that the Defendant is continuing to request documents it set forth in the July

31, 2009 letter. The letter also requests and lists additional documents that were discussed during Mrs. Foster's testimony and explains that the Defendant determined, based on the testimony, that it was necessary to request financial documents dating back to 2002. The letter lists the additional financial documents being requested.

- September 9, 2009: The EUO of Mrs. Foster is conducted. Mrs. Foster testifies that she is still gathering documents and did not review her recorded statement as requested, but did gather information responsive to one of the requests in the September 3 letter. Based on her EUO, the Defendant requests additional documents.

- September 10, 2009: The EUO of Mrs. Foster is conducted. Mrs. Foster brings very few documents responsive to the requests. The following agreement is reached by counsel for the parties:

> Mr. Oberlies: Okay. All right. I suppose this is probably a good place to stop, and we'll adjourn. And by agreement, Counsel, is that correct?
> Mr. Hastings: Correct.
> Mr. Oberlies: And we're going to reconvene at a later date when we gather these documents that we have been talking about for several days.
> Mr. Hastings: Correct.

(Sept. 10, 2009, EUO Tr. 204, ECF No. 21-5 at 59.)

- September 17, 2009: The Defendant's and Plaintiffs' counsel participate in a conference call where the Plaintiffs' counsel indicates that they understand the Defendant's request for information and documents and will work to produce the information and documents.

- September 21, 2009: Oberlies sends a letter to the Plaintiffs' counsel summarizing the September 17 telephone conversation and the Defendant's intent to use the information it has requested to clarify and evaluate the facts and circumstances surrounding the fire and

the Plaintiffs' claim. Oberlies explains, "I have attempted to do my best to not duplicate documents requested, nor to request documents previously requested. However, due to the voluminous nature of the request, as well as the lack of production of previously requested documents, there may be some overlapping of requests." (ECF No. 21-5 at 61.) The letter then uses numbered paragraphs to provide a comprehensive list of all documents requested, but not yet provided.

- October 1, 2009: The Plaintiffs' counsel sends a letter enclosing documents and providing a status on the remaining requests. For many of the requests the Plaintiffs respond by stating that they have requested information or are looking into obtaining the information. For others, the Plaintiffs state that they have already provided documentation, require the Defendant to state with more particularity the documents they seek, or do not have any documentation. The letter states: "We continue to diligently pursue recovering and producing all of the documents State Farm requests, regardless of the multitude and relevance, in hopes that State Farm will promptly evaluate and reimburse the Fosters for their loss." (ECF No. 21-5 at 79.)

- October 19, 2009: Korensky learns that it will be an additional four to six weeks before the Defendant will receive all of the documents requested. The parties agree to tentatively schedule the completion of Mrs. Foster's EUO for November 23–24, 2009, pending receipt of the documents.

- October 30, 2009: The Plaintiffs' counsel provides additional documents to the Defendant by email, including records from Lake City Bank and information regarding the Plaintiffs' time share property purchase.

13

- November 23–24, 2009: The EOU of Mrs. Foster is cancelled and counsel agrees to reschedule the completion of Mrs. Foster's EUO pending receipt of the documents requested.

- December 2, 2009: Oberlies sends a letter to the Plaintiffs' counsel expressing concern over the lack of documents provided since the last EOU of Mrs. Foster on September 10. The Defendant explains that the documents are relevant to its investigation and, specifically, to the Plaintiffs' financial condition at the time of the loss. The letter sets forth all of the documents requested in the September 21, 2009, letter with a notation about the status of the request. The letter invites the Plaintiffs to advise the Defendant if they believe they have already responded to a request that the Defendant deems outstanding. The letter states: "Pursuant to our agreement, we agreed to cancel and reschedule Mrs. Foster's examination under oath to allow your clients additional time to produce these documents. Upon substantial compliance with the requests listed above, we will reschedule the continuation of Mrs. Foster's examination under oath." (ECF No. 21-5 at 102.)

- December 11, 2009: The Plaintiffs' counsel sends the Defendant a letter responding to the Defendant's December 2, 2009 letter. The letter states, "We are disturbed by State Farm's unsupported allegations that the Fosters have produced a 'lack of documents.' Specifically, we are concerned with the growing evidence of State Farm's bad faith in assessing the Foster's claim." (ECF No. 27-6 at 28.) The letter continues:

   Although we have responded materially to your requests, each successive request
   for information letters you send becomes longer. However, the sizes of your letters
   do not reflect new material or information requested, but instead are primarily the
   product of repeated and shuffled requests and responses to our responses to your
   previous requests. By this [December 2] letter, if you are attempting to create a
   noncooperation or noncompliance issue in our clients' policy, it is strictly

foreclosed and we are firmly establishing a reasonableness boundary in responding to your copious and often unreasonable requests.

(ECF No. 27-6 at 28.) The letter posits that Plaintiffs have until January 3, 2010, one year from the loss of their home, to file a lawsuit against the Defendant "for what appears to date to be an abuse of the terms and denial of benefits under" the Policy. (*Id.*) The letter gives notice that the Plaintiffs' consequential damages "will continue to grow" and that the Defendant "may be subject to punitive damages for its bad faith." (*Id.*) The letter also sets forth the status of each of the Defendant's requests. For many of the requests, counsel directs the Defendant to a previous response or notes that the Plaintiffs provided necessary authorizations to obtain the information. For almost every request that the Defendant considered to be outstanding, the Plaintiffs represent that they "possess nothing further to produce." (ECF No. 27-6 at 29–35.) The letter concludes as follows:

> We have diligently inquired into every request, provided you with everything we have related to your requests. The Fosters have provided everything requested within their possession and have signed every authorization you and State Farm have submitted to them to facilitate your own efforts in requesting and obtaining information. The Fosters have more than reasonably complied with the terms of the Homeowner's policy. Your exercise in futility will not cause our clients to ignore their approximate two million six hundred thousand dollar ($2,600,000.00) claim. While we understand that you must diligently examine and evaluate any claim for proceeds under your client's policies, your efforts here have been exhaustive and due to the reduced statute of limitations of one year created by your client, State Farm must decide whether to pay or deny this claim.
> You have until December 23, 2009 to complete your examinations under oath, your evaluation of this claim, and make a decision. If we do not hear from you by then, we must file suit.

(ECF No. 27-6 at 35.)

- December 15, 2009: The Plaintiffs' counsel sends an email to the Defendant suggesting three dates that Mrs. Foster is available for her continued EUO.

- December 15, 2009: Oberlies sends a letter to Plaintiffs' counsel in response to the

Plaintiffs' December 11 letter, stating that the Plaintiffs' letter "strikes a curious tone, given your prior acknowledgment of the amount of documents that were still outstanding at the time we mutually agreed to continue Mrs. Foster's examination under oath." (ECF No. 21-5 at 105.) Oberlies demonstrates by a timeline that each of the Defendant's successive document requests occurred after a significant event, such as the completion of an EUO of one of the insureds or interview of a significant witness, which revealed additional documents that the Plaintiffs did not previously disclose. Oberlies states that the Defendant's investigation reveals that the Plaintiffs have a "vast network of financial relationships with institutions and individuals, many of which have only been discovered by State Farm through its investigation and not from any information provided by your clients," and that the Plaintiffs' failure to provide information during their examinations or appearing at their EUO without having necessary information at their disposal is what necessitated the revisions to the requests for documents. (*Id.*) Oberlies notes that no documents have been received since the December 2, 2009, letter other than the Confidential Settlement Agreement from the construction litigation. The letter explains that, although the Plaintiffs have provided numerous documents, there is still significant information that the Plaintiffs identified in their EUO and agreed to provide that have not been provided. Oberlies states that the records include evidence of the Plaintiffs' financial condition and documents regarding potential third party suspects, "all of which are clearly relevant in a claim involving an intentionally set fire." (*Id.* at 107.) The letter sets forth the Policy section describing the Plaintiffs' duties after a loss and warns that counsel's "unilateral attempt to decide what is reasonable with respect to . . . compliance with the

terms and conditions of the policy of insurance and with regard to the documents they are required to produce is unacceptable." (*Id.*) The letter sets forth that assuming the Plaintiffs respond to the outstanding document requests, the Defendant is prepared to move forward with completing the EUO and asks counsel to contact the Defendant to discuss the production of documents and to make arrangements for scheduling the EUO. The letter clarifies that after the implementation of Indiana Code § 27-1-13-17 on June 27, 2007, the minimum period of a policyholder to bring an action against an insurer is two years from the date of the loss, and thus it is not necessary for the Plaintiffs to initiate a lawsuit by January 3, 2010.

- December 17, 2009: the Plaintiffs' counsel sends the Defendant a letter enclosing Steve Gerber's investigative report regarding the whereabouts of the Foster family on the day of the fire.

- December 30, 2009: The Plaintiffs file this lawsuit against the Defendant for breach of the Policy and bad faith.

- January 15, 2010: Oberlies sends a letter to Plaintiffs' counsel explaining that the Defendant has not been able to complete its investigation due to the Plaintiffs' failure to provide numerous documents and to complete the EUO of Mrs. Foster. The letter offers the Plaintiffs an opportunity to cure their breach of the Policy by submitting documents by February 15, 2010, and completing the EUO of Mrs. Foster. The letter advises the Plaintiffs that their breach of the Policy is reason to deny the claim. The letter also sets forth that filing suit is a violation of the provision that no action be brought unless there has been compliance with the Policy provisions and that, despite the Policy period of one year, the

suit limitation is two years. The Defendant asks that the Plaintiffs to voluntarily dismiss the lawsuit and allow it to complete its investigation.

- August 31, 2010: Oberlies sends a letter to the Plaintiffs' counsel responding to a request from Mrs. Foster for additional living expenses. The letter advances one additional payment, but sets forth that the refusal to provide documents and complete the EUO and filing a lawsuit prior to full compliance with the Policy is a breach of the Policy, and the Defendant is not agreeing to advance any additional amounts pending a decision on the claim.

In addition to the above timeline of the investigation, the following facts are presented for this Court's consideration on summary judgment: The Plaintiffs retained an expert, Lance Langford, to conduct a site inspection of the Plaintiffs' home and prepare a report regarding the cause of the fire. Langford concluded that the cause and origin of the fire at the Plaintiffs' home was undetermined, and that he could not rule that the fire was incendiary because there were too many possibilities that had not been thoroughly ruled out.

## ANALYSIS

The Plaintiffs argue that the Court must deny summary judgment because the Defendant has not established that they breached the insurance contract. Specifically, the Plaintiffs assert that they fully cooperated when they informed the Defendant that they had no further documents to produce and that Mrs. Foster was willing to complete her EOU, that the Policy's duty to cooperate is ambiguous and should be construed in the Plaintiffs' favor, and that the Defendant has failed to show that it was materially prejudiced by the Plaintiffs' actions. The Defendant acknowledges that

the Plaintiffs have produced documents and information and submitted to EUOs, but submits that the Plaintiffs have breached the Policy because the EUO of Mrs. Foster has not been completed due to the Plaintiffs failure to provide documents that they previously acknowledged were still outstanding and that they would continue to gather and produce. The Defendant argues that it is well settled under Indiana law that this failure represents a material breach of the unambiguous Policy duties to provide documents and submit to EUOs, and that an insurer need not show prejudice with respect to an insured's failure to perform specific duties under the policy as such provisions are treated differently than cooperation clauses.

## A.     The Policy's Duty Provisions

The Policy provision at issue sets forth the duties that an insured must perform after a loss to which the insurance may apply. The duties at issue in this case are, "as often as [the insurer] reasonably require[s]" that the insured provide records and documents the insurer requests, and submit to statements and examinations under oath.

The Plaintiffs characterize the Policy terms regarding the provision of records and documents and submission to EUOs as an ambiguous cooperation clause. They argue that, in consideration of their cooperation submitting to examinations, recorded statements, and interviews, and providing a proof of loss, documents, and authorizations for release of records, "[a]t some point" they "must be deemed in compliance with the cooperation clause" and that "the location of that point is subject to a valid dispute." (Pls.' Br. 11–12, ECF No. 27.) Thus, they argue, the cooperation clause is ambiguous and the Court should construe the Plaintiffs as being in

compliance.[1] They also argue that the Defendant must show that it has been materially prejudiced by any noncompliance with the Policy's noncooperation clause before it can avoid paying a claim, and that the Defendant has failed to make this showing.

*Morris v. Economy Fire and Casualty Co.*, 848 N.E.2d 663 (Ind. 2006), forecloses the Plaintiffs' argument that the Policy provision at issue in this case is a cooperation clause that the Defendant may only invoke if it first shows prejudice.  In *Morris*, the insurance policy contained express conditions entitled "Your Duties After Loss" which required the insured to "as often as we reasonably require: (1) show the damaged property; (2) provide us with records and documents we request and permit us to make copies; and (3) submit to examination under oath, while not in the presence of any other insured, and sign same." 848 N.E.2d at 666. The insureds sued the insurance company for breach of contract and failure to deal in good faith after the two sides could not agree on the claim and whether to proceed with an EUO of the insured. *Morris*, 848 N.E.2d at 665. The court held that the contract provision requiring the insureds to provide the insurer with records and documents and submit to an EUO was not a cooperation clause, but "an entirely separate condition that explicitly requires the policyholder to perform specific duties." *Id.* at 666 (defining a cooperation clause as "a 'policy provision requiring that the insured assist the insurer in investigating and defending the claim'" (quoting Black's Law Dictionary 359 (8th ed. 2004)). The court also specifically noted that, "[w]hile disputes regarding alleged breaches of an insured's duty under a separate 'cooperation clause' may necessitate consideration of resulting prejudice to the insurance company, such prejudice is not a necessary consideration in determining the

---

[1] The Plaintiffs appear to be asking the Court to find that they complied with the Policy as a matter of law, which is a purely legal issue. However, considering that the context of the argument is a response to a motion for summary judgment, the Court construes it as a request that the Court find genuine issues of material fact with respect to their compliance.

enforceability of other insurance policy provisions." *Id.* (citing *Miller v. Dilts*, 463 N.E.2d 257, 265 (Ind. 1984)).

The *Morris* court found that the plaintiffs-insureds "breached the contract as a matter of law when they refused to provide an examination under oath" to the defendant insurance company. *Id.* at 666–67. The court discounted that the plaintiffs would have submitted to an EUO if they had been provided copies of their previous statements to the insurance company because participating in the EUO and submitting requested documents "was a contractual obligation." *Id.* at 667. "Compliance was not optional or subject to a trial court determination of reasonableness." *Id.* The contract's reasonableness requirement, the court said, "describes how often the insurer can make requests, not the nature and extent of the information or statement sought." *Id.* (holding that the contract did not "impose an explicit general 'reasonableness' requirement on the insurer regarding *what* documentation the insurer might demand of the insured or in *what* context the insurer might ask for an examination under oath") (emphasis in original).

The Seventh Circuit, in *Employers Mutual Casualty Co. v. Skoutaris*, 453 F.3d 915 (7th Cir. 2005), acknowledged that "[i]n the context of a breach of an EUO clause . . . the Supreme Court of Indiana has established that an insurance company need only show a material breach to prevail." *Id.* at 924. In *Skoutaris*, the insured refused to submit to an EUO regarding the claim he filed for his restaurant after it had been destroyed by fire. *Id.* The court reasoned, "The contract does not allow Skoutaris to ignore his express duties because he felt that he had done enough. . . . Skoutaris's intransigence constituted a willful and intentional breach of the EUO clause," and the district court's ruling for the insurance company's summary judgment motion was correct. *Id.* at 925; *see also Knowledge A–Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 422 (Ind. Ct. App. 2006)

(holding that when the insured's owner did not make himself available for an EUO he breached the contract, making summary judgment for the defendant insurance company appropriate).

Accordingly, the Plaintiffs cannot defend against the Defendant's Motion for Summary Judgment by asserting that the Defendant is relying on an ambiguous cooperation clause or by claiming that the Defendant must show that it was materially prejudiced. The Court now turns to whether the Plaintiffs' actions with regard to document production and Mrs. Foster's EOU constituted a material breach of the Policy as a matter of law.

**B.      Material Breach**

The Defendant can only be relieved of its coverage duties under the Policy if the Plaintiffs breached the contract, and their breach was material. Failure to comply with an EUO provision has been deemed a material breach. In *Morris*, the insureds refused to submit to EUOs or provide documentation of loss until they received copies of their sworn statements. Their refusal was a material breach. In *Skoutaris*, the plaintiff refused to submit to an EUO, claiming that his off-the-record discussion with the insurance company were all that it was entitled to receive. His refusal was a willful and intentional breach of the EUO clause and a material breach of the contract. In *Knowledge A-Z, Inc.*, the plaintiff did not appear for an EUO despite repeated requests and refused to submit requested documentation of loss because he deemed the defendant's requests to be "unduly burdensome and not commensurate with what is to be reasonably expected." 857 N.E.2d at 421. The court found that the plaintiff breached the contract as a matter of law by failing to sit for an EUO. *Id.* at 422. In *National Athletic Sportwear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508 (7th Cir. 2008), the insurer and insured left the insured's first EUO with the expectation that another

EUO would resume once the insurer requested, and the insured provided, additional documents relating to the insured's claims. The insured later objected to the second EUO and refused to participate because he became frustrated and concerned the insurer was harassing him and claimed that a condition of his participation in a second EUO was that it be reasonable. His refusal was deemed a material breach of the insurance contract. 528 F.3d at 522.

In response to the Defendant's Motion for Summary Judgment, the Plaintiffs insist that they provided every document that was in their possession or that they were able to obtain and that they cannot be expected to tender what does not exist. They argue that the "copious amounts of documents [they] provided went well beyond [the Plaintiffs'] duty to cooperate under the Policy terms." (Pls.' Br. 10, ECF No. 27.) However, this Court's review of the designated evidence, even when viewed most favorably to the Plaintiffs, does not support their claim that they fully complied with the Defendant's document requests. The evidence in support of the Plaintiffs' claims that they produced all documents are their own sworn statements and a letter their attorney sent to the Defendant. But the letters between the parties, viewed as a whole, reveal that the Plaintiffs made a conscious decision to halt any attempts to retrieve and produce additional documentation when the investigation neared the one year mark, and that they did so on grounds that they believed the Defendant had sufficient information to investigate the claim, that it was time the Defendant rendered a claims decision, and that the Defendant's requests were an attempt to create an issue regarding their compliance with the cooperation clause.

On September 10, 2009, the parties agreed to continue the EOU of Mrs. Foster until certain documents referenced in the EOU were available. The Defendant assented to putting its request in writing, and did so in a letter dated September 21. In this letter, the Defendant requested copies of

the Plaintiffs' federal income tax returns for 2002, 2003, and 2008, including all payroll check stubs, W-2 forms or other documents that substantiated their reported income and expenses. Although the Plaintiffs had already provided their tax returns for the years 2004, 2005, 2006, 2007, and 2008, the Defendant had previously confirmed in a letter dated September 3 that it was necessary to request financial records dating back to 2002 in response to the Plaintiffs' EUO testimony. In the Plaintiffs' October 1 response letter, they indicated that Mrs. Foster was looking for the tax returns, otherwise they would submit a request to the IRS and requested that the Defendant pay the IRS document request fee. In its December 2 letter setting forth the documents that the Defendant still needed before it could complete the EUO of Mrs. Foster and investigate the Plaintiffs' financial condition at the time of the loss, the Defendant noted that it had not received the requested tax returns and would reimburse the Plaintiffs for the IRS fee to obtain the records. In the Plaintiffs' December 11 letter, they stated with regard to the federal income tax returns, "We have provided you . . . necessary authorizations to obtain financial information. Please see all previous responses or information in your possession related to this claim. Our clients possess nothing further to produce." (ECF No. 27-6 at 29.) The Plaintiffs did not produce their 2002, 2003, or 2008 income tax returns or explain why they would not be submitting a request to the IRS as they previously indicated. Instead, the Plaintiffs shifted the burden to the Defendant to obtain the remaining tax returns.

In its September 21 letter, the Defendant requested bank account statements for January 2002 to the present for numerous accounts. In response, the Plaintiffs indicated that, for many of these accounts, they had sent a request to the financial institution to produce the records. The Defendant repeated the request for bank account statements in its December 2 letter, added a

notation for each account to identify the exact statements that were still outstanding, and asked for a status with respect to those accounts for which the Plaintiffs indicated they had already requested records. The Plaintiffs responded by stating in their December 11 letter that they had requested all the financial information from the various financial institutions and produced everything they received in addition to providing necessary authorizations. The Plaintiffs directed the Defendant to "see all previous responses or information in your possession related to this claim. Our clients possess nothing further to produce." (ECF No. 27-6 at 30.) Despite the number of different accounts included in the Defendant's request, and despite the fact that various requests remained outstanding, the Plaintiffs did not make an attempt to provide an account-specific status of the requested documents.

The Defendant requested mortgage information for Mr. Foster's law office for the two years before the fire. In response, the Plaintiffs indicated that they sent a request to CitiMortgage. Later, in their December 11 letter, the Plaintiffs stated that they had diligently inquired into CitiMortgage's records, produced everything in their possession and provided necessary authorizations to obtain financial information, and possessed nothing further to produce. The Plaintiffs did not produce any documents responsive to this request or explain why documents from CitiMortgage were not available.

The Defendant requested the Plaintiffs' applications for the first and second mortgages on the house that was damaged by the fire. The Plaintiffs responded on October 1 that they did not have a copy of the mortgage application. On December 2, the Defendant informed the Plaintiffs that it had requested the application from CitiMortgage, but the request was refused and the Plaintiffs had to obtain a copy of the application directly from CitiMortgage. The Plaintiffs

responded:

> Even though we provided you all the records related to the mortgages, you still insist on the applications. As you indicated, State Farm requested copies of the applications with the authorizations we provided. If State Farm's request was refused, please provide us with the protocol to request the applications and we will be happy to execute whatever request is necessary. Otherwise, please see all previous responses or information in your possession related to this claim. Our clients possess nothing further to produce.

(ECF No. 27-6 at 31.) This response acknowledges that the application request was still outstanding.

The Defendant requested documentation of the income the Plaintiffs would receive from selling or reselling items on eBay as discussed during Mrs. Foster's August 6 EUO. The Plaintiffs, on October 1, indicated that they were making a reasonable inquiry into this request. When the Defendant asked for an update into their inquiry, the Plaintiffs responded on December 11 that the Defendant should see all previous responses or information in their possession and that they possessed nothing further to produce. The Plaintiffs did not produce any documentation with respect to this request or attempt to explain why none was available.

The Defendant requested documentation regarding how much money Jamison Foster received for his injuries in a car accident with Mrs. Foster and what happened to the money as discussed during Jamison's EUO. The Plaintiffs initially responded that they were making a reasonable inquiry, and later responded that after their inquiry, they had nothing further to produce. There is no evidence that the Plaintiffs provided any documentation in response to this request or attempted to explain why none was available.

The Plaintiffs' December 11 letter communicated to the Defendant that the Plaintiffs did not intend to produce any more documentation. The Defendant was not required to accept the

Plaintiffs' claim that they fully complied with all document requests because the Defendant's inquiries at EOUs, their records of documents provided, and the parties' correspondence revealed otherwise. Although the Court must assume, for purposes of summary judgment, that the Plaintiffs believed that they had no further duties under the Policy, it is not required to find that this belief was accurate, or even reasonable, if it is not supported by the facts in the record. Prior to the December 11 letter, the Plaintiffs did not object to the content of any of the Defendant's requests and agreed to continue the EOU of Mrs. Foster to obtain the requested information. The Plaintiffs then state in their December 11 letter, with little explanation, that they have nothing further to produce for some of the same categories of requests that they previously acknowledged were still outstanding and were seeking to produce. Moreover, in conjunction with stating that they had either provided everything requested within their possession or signed the appropriate authorizations, the Plaintiffs described the Defendant's efforts as exhaustive and demanded that the Defendant complete the EUO within two weeks, evaluate the claim, and make a decision. The Plaintiffs also accused the Defendant of bad faith, and asserted that they were "firmly establishing a reasonableness boundary in responding to your copious and often unreasonable requests." (ECF No. 27-6 at 28.) Viewing the record as a whole, the Defendant was entitled to conclude that the Plaintiffs had not carried through with previous assurances that they were attempting to obtain documentation—documentation that the Defendant believed was necessary to obtain a complete picture of the Plaintiffs' financial condition and to effectively question Mrs. Foster. Accordingly, the Defendant warned the Plaintiffs that they could not unilaterally decide what was reasonable concerning compliance with their document requests and the terms of the Policy. Rather than respond to this warning with believable, detailed explanations of their efforts with respect to each

document request, the Plaintiffs sued the Defendant for breach of contract and breach of the duty of good faith. This course of action was a material breach of the Policy.

As a general matter, it should be noted that insureds cannot put conditions on their existing contractual duties. The reasonableness requirement does not go to what documentation the insurer might demand of the insured. The Plaintiffs are not allowed to decide when document collection efforts have been exhausted. Whether the fire was intentionally set, even according to the Plaintiffs' own expert, could not be ruled out and thus remained a reasonable area of investigation. Many of the categories of documents for which the Plaintiffs stated they had nothing further to produce related to the Plaintiffs' financial condition before the fire. Moreover, each request was preceded by an event in the investigation that led the Defendant to believe that additional information was relevant to its investigation of a fire that it had reason to believe was intentionally set. The Plaintiffs also appear to ignore that many of the delays in investigating the fire and making a claims decision were caused by the Plaintiffs themselves. They sought extensions of time, hired new counsel, and appeared for EOUs without requested documentation. When the investigation neared the one-year mark, the Plaintiffs claimed that the Defendant's requests were unreasonable and that they had nothing further to produce. The Defendant, however, was not contractually obligated, under the circumstances, to make its decision within this one-year period.

The Plaintiffs argue that the Defendant should have offered to toll the statute of limitations. The Defendant had already expressed to the Plaintiffs that it had no intention of enforcing the Policy's one-year statute of limitations, and contractual provisions limiting the time to commence suit may be waived, either expressly or impliedly. *Summers v. Auto-Owners Ins. Co.*, 719 N.E.2d 412, 414 (Ind. Ct. App. 1999) (citing *Schafer v. Buckeye Union Ins. Co.*, 381 N.E.2d 519, 522

(1978)). The *Summers* court provided the following analysis of waiver that may result from acts of the insurer causing the insured to delay bringing suit until after the time provided in the policy:

> [C]ontractual limitation periods may be waived by an insurer if its conduct is sufficient to create a reasonable belief on the part of the insured that strict compliance with the policy provision will not be required. The focus of our inquiry then is upon the relationship between the parties, seeking to determine "whether anything has been done . . . which would cause the insured to reasonably believe the limitation period will not be insisted upon." If such a belief has been fostered by the insurer, it may no longer raise the limitation period as a defense. "To hold otherwise," . . . "would be to allow the insurer to lull an insured into not pressing his rights and then deny liability on the basis of the limitation period."

719 N.E.2d at 415 (brackets and ellipses in original) (emphasis omitted) (quoting *Wingenroth v. Am. States Ins. Co.*, 455 N.E.2d 968, 970 (Ind. Ct. App. 1983) (citations omitted)). Here, the conduct on the part of the Defendant was sufficient to justify a reasonable belief on the Plaintiffs' part that the Defendant would not insist on compliance with the Policy's one-year limitations period or raise the limitations period as a defense. In its December 15 letter, the Defendant advised the Plaintiffs that their attorney's statement that they had to initiate suit by January 13, 2010, was not accurate since the implementation of Indiana Code § 27-1-13-17 establishing a two year minimum period of a policyholder to bring an action against an insurer.[2] This statement was

---

[2] Indiana Code section 27–1–13–17 was enacted on July 1, 2007, and provides:
(a) This section applies to a policy of insurance that:
(1) covers first party loss to property located in Indiana; and
(2) insures against loss or damage to:
(A) real property consisting of not more than four (4) residential units, one (1) of which is the principal place of residence of the named insured; or
(B) personal property in which the named insured has an insurable interest and that is used within a residential dwelling for personal, family, or household purposes.
(b) A policy of insurance described in subsection (a) may not be issued, renewed, or delivered to any person in Indiana if the policy limits a policyholder's right to bring an action against an insurer to a period of less than two (2) years from the date of loss.
Ind. Code § 27–1–13–17.
This code section was enacted after the Policy was entered into between the parties. "Unless there are strong and compelling reasons, statutes will normally be given prospective application," and retroactive application is the exception. *Metro Holding Co. v. Mitchell*, 589 N.E.2d 217, 219 (Ind. 1992)

sufficient to waive the limitations period. Again on January 15, 2010, the Defendant's attorney invited the Plaintiffs' attorney to dismiss the lawsuit and allow it to complete its investigation and specifically stated that, despite the Policy language, the implementation of Indiana Code § 27-1-13-17 established a two year statute of limitations. Accordingly, the Plaintiffs cannot use the Policy limitation as justification for deciding to cease attempts to locate and deliver documents the Defendant requested.

The Plaintiffs argue that the Defendant's Motion fails to acknowledge the many hours of examination that they and their family submitted to and the thousands of pages of documentation that they provided. The Court does not doubt that in some cases an insured will have substantially complied with document requests despite a failure to meet every demand. This is not such a case. The Plaintiffs asserted that certain requests for documentation would not be honored due to their unreasonableness and then demanded that the Defendant make a claims decision because the one-year statute of limitations was going to expire. Even when the Defendant assured the Plaintiffs that it did not intend to insist on the one-year limit and required the Plaintiff's compliance with their duties before it could make an informed decision, the Plaintiffs chose to file a lawsuit. The Plaintiffs then ignored the Defendant's request that the Plaintiffs voluntarily dismiss the lawsuit and submit further documentation and complete the EUO of Mrs. Foster so the Defendant could complete its investigation. The Plaintiffs' unsupported claim that they fully complied with all document requests could not convince a reasonable jury that the Defendant was the first to breach

---

(quoting *Gosnell v. Ind. Soft Water Serv., Inc.*, 503 N.E.2d 879, 880 (Ind. 1987)). Thus, the Defendant's belief (as implied in its letter) that the two-year statute of limitations would automatically govern was not technically correct. The Defendant's statement was nevertheless relevant to whether the Defendant waived the Policy's limitation period.

its contractual obligations. *See Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind. Ct. App. 2001) (recognizing that Indiana courts have held that the party first guilty of a material breach of a contract may not maintain an action against the other party or seek to enforce the contract against the other party for a subsequent breach). A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. Fed. R. Civ. P. 56(a), (c)(2). Because the Plaintiffs have materially breached their duties under the Policy, the Defendant is entitled to summary judgment on the Plaintiffs' breach of contract claim.

## C.     Bad Faith Claim

"Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993). While there is no exhaustive or exclusive list of bad faith actions that an insurer can take, the obligation of good faith and fair dealing includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) (quoting *Hickman*, 622 N.E.2d at 519). For example, an insurer that denies liability "knowing that there is no rational, principled basis for doing so had breached its duty." *Hickman*, 622 N.E.2d at 520; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) (holding that to prove bad faith in the denial of an insurance claim, "the plaintiff must establish . . . that the insurer had knowledge that there was no legitimate basis for denying liability"); *Monroe Guar.*,

829 N.E.2d at 976 (holding that in cases where bad faith is alleged due to denial of coverage, a plaintiff must establish that insurer had knowledge that there was no legitimate basis to deny liability); *Allstate Ins. Co. v. Clancy*, 936 N.E.2d 272, 279 (Ind. Ct. App. 2010) (stating that an insurer that denies liability knowing that there is no rational, principled basis for doing so has breached its duty of good faith). "As a general proposition, '[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" *Monroe Guar.*, 829 N.E.2d at 977 (citing *Colley v. Ind. Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)).

A good faith dispute about the amount of a valid claim or about whether the insured has a valid claim does not supply the grounds for a bad faith cause of action. *Hickman*, 622 N.E.2d at 520; *see also Monroe Guar.*, 829 N.E.2d at 976. "This is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Hickman*, 622 N.E.2d at 520. "Similarly, the lack of diligent investigation alone is not sufficient to support an award." *Id.*

The Plaintiffs claim that because they informed the Defendant that they had nothing further to produce and needed a decision before the contractual limitation period expired or else they would file suit, and the Defendant never made a decision, a jury must be allowed to decide their claim that the Defendant made an unfounded refusal to pay policy proceeds. The Plaintiffs claim that the Defendant's failure to offer the Plaintiffs a formal tolling agreement is further evidence of its bad faith because it placed the Plaintiffs in a predicament of either filing suit or possibly facing a later ex post facto challenge to the new statutory provision setting a two year limitations period.

To prove that an insurance company committed the tort of bad faith in Indiana, a plaintiff must establish that his claim was underpaid or wrongfully denied in the first place. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011). Other courts have also found that there can be no action for bad faith without adjudication that there is coverage under the insurance policy. *See, e.g.*, *Am. Nat'l Red Cross v. Travelers Indem. Co.*, 896 F. Supp. 8, 11 (D.D.C. 1995); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995); *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). Here, the Defendant did not deny the claim. It was still investigating the claim when the Plaintiffs filed their lawsuit despite assurances from the Defendant that it did not intend to enforce the one-year contractual limitation, but was relying on a two-year statute of limitations, and that it needed more information to make an informed decision. In addition, the sequence of events in this case do not give rise to an indication of harassment, dishonest purpose, ill will, unfounded delay, or bad faith. Rather, they reveal that the Defendant exercised its contractual right to investigate the cause of the fire, which included obtaining financial documentation from the Plaintiffs. In light of the unknown cause of the fire and the existence of evidence that it may have been intentionally set, the Defendant's questions about the Plaintiffs' financial condition before making a claims decision had a rational, factual basis and cannot be said to be in bad faith.

The Plaintiffs also claim that the Defendant's investigative conduct was egregious. Much of the basis of this claim is that the Defendant misrepresented the Plaintiffs' efforts to produce documents, including accusing them of failing to produce documents. As discussed above, the Defendant had ample reason to conclude that the Plaintiffs had not fully complied with their duty to provide documents. The Plaintiffs themselves acknowledged the numerous requests that

remained outstanding and assured the Defendant that they were seeking the information. When the Defendant followed-up on these assurances two months later, the Plaintiffs asserted that they had produced everything in their possession and then, nineteen days later, filed this lawsuit. This left inadequate time to confirm whether the Plaintiffs had indeed complied with the Defendant's requests. The Plaintiffs certainly could not convince a jury that the Defendant had no rational, principled basis for its attempts to obtain more documents and to follow-up on requests that were still outstanding.

There are no genuine issues of material fact on the Plaintiff's bad faith claim and the Defendant is entitled to judgment as a matter of law. Because the standard for obtaining punitive damages is even higher than that for establishing a breach of the duty to exercise good faith, *see Hickman*, 622 N.E.2d at 520 (holding that "proof that the tort was committed is not sufficient to establish the right to punitive damages"), the Plaintiffs' claim for punitive damages also fails.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [ECF No. 21] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on August 17, 2011.

         s/ Theresa L. Springmann       
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT